UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
STEPHEN COLE-HATCHARD,                           :
                          Plaintiff,             :
                                                 :
v.                                               :
                                                 :
GEORGE HOEHMANN, as Supervisor for the           :
Town of Clarkstown, New York, and in his         :
individual capacity; FRANK BORELLI, as           :     **OPINION AND ORDER**
Councilman and Deputy Supervisor for the         :
Town of Clarkstown, New York, and in his         :     16 CV 5900 (VB)
individual capacity; JOHN J. NOTO, as            :
Councilman for the Town of Clarkstown, New       :
York, and in his individual capacity;            :
ADRIENNE D. CAREY, as Councilwoman for           :
the Town of Clarkstown, New York, and in her     :
individual capacity; TOWN OF                     :
CLARKSTOWN, NEW YORK; and TOWN                    :
BOARD OF THE TOWN OF CLARKSTOWN,                 :
NEW YORK,                                        :
                          Defendants.            :
-------------------------------------------------------------x

Briccetti, J.:

        Plaintiff Stephen Cole-Hatchard brings this action under 42 U.S.C. § 1983, against

defendants Town of Clarkstown (the "Town"), the Town Board of the Town, Town Supervisor

George Hoehmann, Councilman and Deputy Supervisor Frank Borelli, Councilman John J. Noto,

and Councilwoman Adrienne D. Carey (together, "defendants").  Plaintiff alleges defendants

retaliated against him for exercising his First Amendment rights to speech and association, and

violated his Fourteenth Amendment right to equal protection.[1]

---

[1]     Plaintiff also brought claims against defendants, and Councilwoman Stephanie Hausner,
for violations of plaintiff's constitutional rights to free speech, free assembly, and due process,
violations of the New York Labor Law, and common law defamation.  By Opinion and Order
dated September 15, 2017, the Court dismissed those claims.  (Doc. #43).  By Stipulation and
Order dated August 28, 2019, plaintiffs' remaining claims were dismissed as against Stephanie
Hausner.  (Doc. #165).

Before the Court is defendant's motion for summary judgment.  (Doc. #172).

For the reasons set forth below, the motion is DENIED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

The parties have submitted memoranda of law, statements of material facts pursuant to Local Civil Rule 56.1, declarations, affidavits, and supporting exhibits.  Together, these documents reflect the following factual background.

Plaintiff was a law enforcement officer for the Clarkstown Police Department ("CPD") for over thirty years.  Throughout his time at the CPD, plaintiff acted, sometimes officially and sometimes unofficially, as a public information officer for the CPD.  Accordingly, plaintiff often interacted with various reporters and members of the press, including Steven Lieberman of The Journal News.  Plaintiff used his CPD email to correspond with the press.

I.    The Strategic Intelligence Unit

In early 2014, the CPD and the Rockland County District Attorney's Office ("Rockland DA") established a joint task force known as the Strategic Intelligence Unit ("SIU"), to gather intelligence and information about criminal activity within Rockland County.  The SIU utilized publicly available social and online media to surveil for criminal activity.  At all relevant times, the SIU was headquartered in Pearl River, New York.  The CPD is headquartered at 20 Maple Avenue, New City, New York.

At some point in 2014, plaintiff was selected as the Director of the SIU.  As Director, plaintiff reported to Peter Modaferri, the Chief of Detectives of the Rockland DA, and to Michael Sullivan, the Chief of the CPD.  During his time as SIU Director, plaintiff continued to interact with various reporters and members of the press.

In late 2014 or early 2015, plaintiff began working full-time at SIU headquarters in Pearl River.

II.      Hoehmann's Campaign for Town Supervisor

In 2015, while Hoehmann was a Republican member of the Town Board, he ran a campaign to unseat incumbent Town Supervisor Alexander Gromack.  During this time, Michael Garvey, a CPD Sergeant, had a pending lawsuit against the Town respecting his alleged work-related disability.  He sued the Town in federal court, seeking to return to active duty long enough to recover full retirement benefits.[2]

In August 2015, the Town Board voted to terminate Michael Garvey from his employment at the CPD.  Councilman Borelli and then-Councilman Hoehmann voted against Michael Garvey's termination.  Two other Town Board members and Supervisor Gromack voted in favor of Michael Garvey's termination.

On October 9, 2015, about one month before the Clarkstown election, a company called Institute for Municipal Safety Research, LLC ("IMSR"), contributed $109,000 to the Rockland County Republican Committee (the "Republican Committee") and an additional $107,900 to the New York State Committee of the Reform Party (the "Reform Party").  (See Doc. #177 ("Mele Decl.") at Exs. 5, 6).  The Reform Party had a close connection with former Westchester County Executive Rob Astorino.  (Mele. Decl. Ex. 9 ("Garvey Tr.") at 78).  The Republican Party paid nearly $39,000, and the Reform Party paid $96,000, to support Hoehmann's campaign for Supervisor.  (Mele Decl. Exs. 7, 8).

Lawrence Garvey, an attorney who was Hoehmann's political advisor during the campaign and Chairman of the Republican Committee, testified that IMSR was a client of his

---

[2]      Michael Garvey also commenced an Article 78 proceeding against the Town, challenging the Town's termination of disability benefits.

law firm, and that on October 1, 2015, his law firm prepared Articles of Organization for IMSR. (Garvey Tr. at 82).[3] He further testified that Michael Garvey was affiliated with IMSR, and that IMSR's prepared Articles of Organization indicated Michael Garvey as the "organizer" of IMSR. (Id. at 40, 43).

Lawrence Garvey further testified that on September 17, 2015, he received an email from Michael Lawler, Astorino's former gubernatorial campaign manager, in which Lawler asked Lawrence Garvey and Michael Garvey to meet with Lawler and Astorino to discuss campaign contributions. (Garvey Tr. at 73–75). He also testified that on October 6, 2015, he received another email from Lawler, which indicated Astorino would be making donations to, among others, Hoehmann. By email dated October 23, 2015, Lawrence Garvey asked Hoehmann to "call Mike Lawler and thank him for the contributions that Rob Astorino gave you." (Mele Decl. Ex. 26).

On October 28, 2015, five days before the Supervisor election, The Journal News reporter Lieberman published an article respecting the contributions IMSR had made to the Republican Committee and Hoehmann on October 9, 2015, noting the Rockland Democrats had asked for a federal investigation into same. (Mele Decl. Ex. 13).

On November 3, 2015, Hoehmann defeated Gromack in the general election to become the next Town Supervisor.

Four days later, in an email to Hoehmann, Lawrence Garvey wrote, inter alia: "I will no longer handle Mike Garvey for you. I won't manage his expectations for you, I won't play interference and I won't answer for you when you are unable to give him what he wants." (Mele Decl. Ex. 12). When asked at his deposition what Lawrence Garvey had meant by this

---

[3]     The parties indicate Lawrence Garvey has no relation to Michael Garvey.

statement, Hoehmann responded he did not know.  (Mele Decl. Ex. 1 ("Hoehmann Tr.") at 120).

Hoehmann did, however, testify he assumes Lawrence Garvey was referring to Michael

Garvey's pending litigation against the Town.  (Id. at 122).

On January 5, 2016, Hoehmann took office as Town Supervisor.

III.     The Picott Incident and Plaintiff's March 2016 Communications with Lieberman

On March 28, 2016, members of the CPD and other local police departments responded

to a domestic incident at the Orangetown, New York, residence of Rodney Picott, who was a

CPD Officer at the time.  Picott had barricaded himself, his girlfriend, and their two children, in

the residence, and Picott refused to come out.

According to defendants, Picott had a lengthy history of employment and personnel

issues with the CPD, and, at the time, had a pending federal lawsuit against the Town in

connection with its handling of a 2012 domestic incident involving Picott.

Between March 16 and March 28, 2016, plaintiff, using his CPD email account,

exchanged a series of eleven emails with Lieberman.  In the final two emails of this series, on

March 28, 2016, Lieberman asked plaintiff "What's up with Picot[t]?  Is he out . . ." (Mele Decl.

Ex. 20 at ECF 1),[4] to which plaintiff responded:  "721-0774.  Don't want an email on that."

(Id.).  Shortly thereafter, Lieberman called plaintiff.  Plaintiff claims, however, that he and

Lieberman did not speak about Rodney Picott during this call.  (Loomba Decl. Ex. K ("Pl. Tr.")

at 156–57).

The nine other emails of the email thread predate the Picott incident.  Those emails

concern undescribed information plaintiff was preparing for Lieberman, Michael Garvey's

federal lawsuit against the Town, the Town's potential settlement of that lawsuit, an upcoming

---

[4]     "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case
Filing system.

Town Board vote, and an efficiency study of the CPD the Town had planned to conduct with the help of someone plaintiff referred to as "an Astorino guy."  (See generally Mele Decl. Ex 20).  In one of the emails, dated March 27, 2016, plaintiff writes to Lieberman, in what appears to be a remark about the campaign contributions IMSR made on October 9, 2015:  "Amazing what $200 gs can buy you nowadays!!"  (Id. at ECF 4).

IV.    Email Retention Program and Discovery of Plaintiff's Picott Emails

Robert Paul, a Network Security Administrator for the Town, testified that he met with Hoehmann and Hoehmann's Chief of Staff and the Town's Director of Finance, Vincent Balascio, soon after Hoehmann was sworn into office in early 2016, and was instructed by Hoehmann and Balascio to procure an email retention and archival program for the Town, to retain and archive all Town employees' emails.  (Mele Decl. at Ex. 16).  According to Paul, the Town had experienced some difficulty responding to Freedom of Information Law ("FOIL") requests in the past, and an email retention and archival program would help preserve Town communications.  The Town then acquired an email retention and archival program called "Google Vault."

Paul testified that Balascio requested and was provided administrative access to the Google Vault program, which allowed him to search for and read emails sent by Town officials and employees.  However, before Balascio obtained his own access to the Google Vault program, he used Paul's credentials to use the program.  (Doc. #174 ("Loomba Decl.") Ex. J ("Balascio Decl.")

¶ 11).

According to Balascio, in January 2016, he became "aware that a federal investigation had been initiated to investigate the propriety of contracts and payments made by the [Gromack]

administration to certain vendors." (Balascio Decl. ¶ 3). Balascio stated that in early 2016, as

Director of Finance, he was asked by an individual to make certain payments to the individual's

development company for work respecting a project that had been approved previously by

Gromack. Balascio claimed he used the Google Vault system at that time to "attempt to locate

emails and documentary attachments regarding" this project (id. ¶ 10), "to assure that [he] would

not be complicit in any fraud against the Town and that the payments . . . request[ed] were

appropriate." (Id. ¶ 7). According to Balascio, he used various keywords—for example,

"Supervisor," "Alexander," "Alexander Grommack," "Alex Grommack," and "Alex"—to locate

such emails and other documents. (Id. ¶ 10).[5]

According to defendants, while Balascio was using the Google Vault program in early

2016, but sometime after March 28, 2016, he discovered the March 28, 2016, email exchange

between plaintiff and Lieberman, which concerned Picott. (Balascio Decl. ¶ 14). Plaintiff

claims the audit log—a list of all searches conducted in the Google Vault program—contains no

searches around that time that would have rendered results including any of plaintiff's emails, or

any of plaintiff's emails with Lieberman, in March 2016, including the two emails respecting

Picott. Rather, plaintiff contends the audit log shows that in June 2016, Balascio had conducted

other searches in the Google Vault program, including searches of plaintiff's emails for the term

"Lieberman," which is how Balascio actually discovered the Picott emails. (See, e.g., Audit Log

at ECF 84, 85).

Apparently concerned that such "communication with the press about a fellow officer

violated the Code of Conduct, [Balascio] brought [it] to the attention of the Town Attorney, Lino

---

[5]      An audit log, which shows all searches of the Google Vault system conducted between
February 2, 2016, and February 7, 2017, does not show any searches for "Grommack" or
"Alexander Grommack." (Mele Decl. Ex. 22 ("Audit Log")). Rather, the log indicates searches
including "Gromack" as a search term, which is the correct spelling. (Id. at ECF 6).

Sciarretta." (Balascio Decl. ¶ 15). Defendants contend that in June 2016, Sciarretta then informed Town labor counsel, Vincent Toomey, about the two March 28, 2016, Picott emails between plaintiff and Lieberman. (Loomba Decl. Ex. D ("Toomey Decl.") ¶ 13). According to defendants, Toomey viewed the emails as a security breach for several reasons. First, the Town had preferred charges against Picott for his involvement in the March 28, 2016, incident. Second, Toomey considered the emails to suggest plaintiff had provided Lieberman confidential information about Picott. Accordingly, given plaintiff's position in the SIU, his access to certain information at the SIU, his frequent contact with the press through his position at the SIU, and the SIU's remote location with no on-the-scene supervision by the Town, Toomey apparently was concerned that plaintiff's continued employment as Director of the SIU could jeopardize the Town's involvement in the ongoing Picott investigation and also the pending lawsuit Picott had against the Town. According to Toomey, he then brought the emails to the Town Board's attention.

V.      Town Board Meeting

Mr. Toomey, the Town Board—Supervisor Hoehmann, Councilmen Borelli and Noto, and Councilwomen Hausner and Carey—and Chief Sullivan met on June 28, 2016. At the meeting, Toomey told all present he believed plaintiff's emails with Lieberman about Picott constituted a security breach, and that the matter should be investigated. According to defendants, Hoehmann, Borelli, Noto, Hausner, and Carey did not know about the Picott emails until this meeting. Furthermore, according to defendants, Hoehmann, Borelli, Noto, Hauser, Carey, and Toomey were not aware of any of the nine other emails in the March 2016 email thread between plaintiff and Lieberman that were exchanged prior to the March 28, 2016, Picott emails.

VI.   <u>Transfer from SIU and Internal Investigation</u>

The next day, on June 29, 2016, Chief Sullivan served plaintiff with a notice of internal investigation.  Later that day, Chief Sullivan met with plaintiff, who admitted to corresponding with Lieberman at or about the time of the Picott incident in March 2016.

On July 1, 2016, following discussions with other Town Board members, Supervisor Hoehmann sent Chief Sullivan an email directing Sullivan to immediately reassign plaintiff from his position as Director of the SIU to another position located at CPD headquarters.  The email states in pertinent part:

> After separate consultation with other members of the Town Board who, as you know, serve as the Board of Police Commissioners, it is our position that there is a substantial risk to the Town and the Department in leaving Sergeant Cole-Hatchard in his current position.  Irrespective of the outcome of your investigation and whether disciplinary action is taken as a result of that investigation, his immediate reassignment today out of the Intelligence Unit to other duties appropriate to his status and rank as a detective sergeant within 20 Maple Avenue is necessary and directed.
>
> Further, given the Board['s] . . . concern over a potential breach that may have occurred, Sergeant Cole-Hatchard is not to have any duties that place him in contact with members of the press and media, either direct or indirect.

(Loomba Decl. Ex. T).  According to defendants, Toomey advised Hoehmann to direct plaintiff's immediate reassignment and send the above email to Sullivan.

Although Chief Sullivan transferred plaintiff from the SIU to the Juvenile Aid Bureau ("JAB") at CPD headquarters, he did not do so immediately, as directed.  Accordingly, on about July 20, 2016, Chief Sullivan was suspended from the CPD, and Captain Robert Mahon assumed the position of Acting Chief of Police.

When plaintiff was reassigned to JAB, his title changed from "Intelligence Sergeant" to "Detective Sergeant," and his salary remained the same.  (Pl. Tr. at 200–01).  According to plaintiff, his CPD vehicle was taken away, he was reassigned to a cubicle, he lost his ability to

work overtime, and, unlike at the SIU, he had no supervisory responsibilities.  Indeed, plaintiff

testified that when he was named Detective Sergeant at JAB, there already was a detective

sergeant at JAB.  (Id. at 201–02).

On August 11, 2016, the CPD finalized a report of the investigation of plaintiff's

communications with Lieberman.  (Loomba Decl. Ex. R ("Exoneration Report")).[6]  The report

"exonerated [plaintiff] from the allegation that he discussed confidential information with a

member of the media."  (Id. at 8).  Acting Chief Mahon concluded that although plaintiff and

Lieberman exchanged emails about Picott on March 28, 2016, "the internal affairs case on Picott

was not initiated until the next day, March 29, 2016," and that "[a]t the time of the [March 28,

2016,] email by Lieberman, it would have been highly unlikely that [plaintiff] had any

confidential information to reveal."  (Id. at 7).   The report also confirmed the two Picott emails

were from a thread of eleven emails, nine of which predated the Picott incident and had nothing

to do with that incident.[7]

VII.   United States Attorney's Office Letter and Article 78 Counterclaim Against Plaintiff

When Chief Sullivan was suspended in July 2016, the Town retained attorney William

Harrington to prosecute charges preferred against him.

According to defendants, shortly after Harrington was retained, Balascio handed him

several documents and emails that suggested some inappropriate conduct had taken place at the

---

[6]     The first four pages of the Exoneration Report were prepared by Chief Sullivan, who
began to prepare the report on June 29, 2016.  (Loomba Decl. Ex. E ("Sullivan Tr.") at 159–
162).  The remaining four pages of the Exoneration Report were prepared by Acting Chief
Mahon, who completed the report after Sullivan's July 20, 2016, suspension.  (Exoneration
Report at 5–8).

[7]     As noted above, these other emails mentioned Michael Garvey's federal lawsuit against
the Town, a pending efficiency study of the CPD and Astorino's alleged connection to same, a
Town Board vote, an unspecified report plaintiff was assembling for Lieberman, and campaign
donations.

SIU when plaintiff was the Director.  Defendants claim these documents "showed that with Cole-Hatchard's knowledge and, in most instances, direct participation, the SIU (i) investigated arrest records of private citizens" without cause; "(ii) developed retribution campaigns against the Rockland County Sheriff and a Clarkstown Town Judge; and (iii) printed and forwarded social media profiles of citizens who had expressed an interest in an article critical of the very high salaries earned by Clarkstown police officers."  (Doc. #179 ¶ 161).  Defendants believed these documents also implicated Chief Sullivan, as he was plaintiff's supervisor when plaintiff was SIU Director.

Defendants claim Balascio obtained the above documents on his own initiative.

By letter to Acting Chief Mahon dated August 18, 2016, Harrington requested the CPD preserve Chief Sullivan's and plaintiff's electronic devices and data for inspection.

Harrington testified that after he received from Balascio the collection of documents described above, he drafted a letter to the United States Attorney's Office in White Plains ("USAO") to report on this information.  (Loomba Decl. Ex. G ("Harrington Tr.") at 36–37). According to defendants, Harrington then advised Supervisor Hoehmann to sign and send the letter to the USAO, which Hoehmann did on August 24, 2016.  (Loomba Decl. Ex. Z).

The day before, on August 23, 2016, Chief Sullivan commenced an Article 78 proceeding against defendants to challenge his suspension from the CPD.  The proceeding was removed to federal court, and on August 29, 2016,  defendants filed an answer, which included counterclaims against Sullivan and plaintiff based on the same information and allegations contained in the letter to the USAO.

VIII.   <u>Plaintiff's Resignation</u>

On September 1, 2016, Acting Chief Mahon notified plaintiff that he needed to secure plaintiff's department computer for the Town's ongoing investigation.  (Loomba Decl. Ex. Y ("Mahon Aff.") ¶ 5).  Later that day, Mahon removed and secured plaintiff's computer.  (<u>Id</u>. ¶ 6).

However, before Acting Chief Mahon retrieved plaintiff's computer, plaintiff removed the computer's internal hard drive.  Plaintiff then contacted the Rockland DA and the New York State Attorney General's Office to ask whether they would take possession of the hard drive.  Both offices refused.  Plaintiff then brought the hard drive to the office of a computer expert he had known for many years.  There, plaintiff placed the hard drive into a different computer and ran a program to delete files from the hard drive.

The following day, September 2, 2016, plaintiff handed to a CPD detective a brown paper bag, stapled shut, containing the hard drive.  The CPD detective informed Acting Chief Mahon of this development, and on September 3, 2016, Mahon placed plaintiff on administrative leave pending an internal investigation.

The next day, on September 4, 2016, plaintiff resigned from the CPD.

IX.   <u>Plaintiff's Claims</u>

Plaintiff claims defendants retaliated against him after they discovered he had exchanged a series of emails with Lieberman, a reporter who was investigating allegations of public corruption involving Supervisor Hoehmann and campaign contributions Michael Garvey made through IMSR during Hoehmann's campaign for Town Supervisor.  He also claims he was constructively discharged in retaliation for his exercise of protected speech and association.

Defendants contend plaintiff was removed from his position at the SIU because of the March 28, 2016, emails respecting Picott that plaintiff had exchanged with Lieberman, which

indicated plaintiff had committed a security breach by disclosing confidential information to the

press.  Further, defendants claim plaintiff's removal from his position at the SIU was necessary

because plaintiff's ability as SIU Director to continue to communicate with the press might have

negatively affected the Town's charges against Picott, its internal investigation of same, and the

then-pending lawsuit Picott had against the Town.  Moreover, defendants argue they had nothing

to do with Balascio's discovery of certain information that resulted in subsequent measures taken

against plaintiff—the letter to the USAO and counterclaim against plaintiff in Chief Sullivan's

lawsuit against defendants—and, accordingly, such measures do not constitute retaliation.

## DISCUSSION

I.      Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing

law. . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot

preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).[8]

A dispute about a material fact is genuine if there is sufficient evidence upon which a

reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir.

---

[8]      Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 322–23.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury reasonably could find for him.  Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper.  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).  "In determining whether there are genuine issues of material fact to be tried, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individuals strands of evidence; rather, it must review all of the evidence in the record."  Davis-Garett v. Urban Outfitters, Inc., 921 F.3d 30, 45 (2d Cir. 2019).

In deciding a motion for summary judgment, the Court need consider only evidence that would be admissible at trial.  Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).  Accordingly, bald assertions, completely unsupported by admissible evidence, are not sufficient to overcome summary judgment.  Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

II.     First Amendment Retaliation Claims

Defendants argue plaintiff fails as a matter of law to establish First Amendment retaliation claims based on freedom of speech or association.

The Court disagrees.

Retaliation claims based on freedom of speech are subject to the same analysis as retaliation claims based on freedom of association.  See Lynch v. Ackley, 811 F.3d 569, 583 (2d Cir. 2016).  "A plaintiff asserting a First Amendment retaliation claim must establish that:  "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech."  Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015).  "Once a plaintiff has presented such evidence, the defendant may respond by showing, by a preponderance of the evidence, that it would have taken the same adverse employment action regardless of the plaintiff's conduct."  Bierce v. Town of Fishkill, 656 F. App'x 550, 552 (2d Cir. 2016) (summary order).

Activity is protected only if it "touches on a matter of public concern."  Wrobel v. County of Erie, 692 F.3d 22, 28 (2d Cir. 2012).  "Whether association or speech is on a matter of public concern is a fact-intensive inquiry; nevertheless it is a question of law for the court to decide."  Id.

A.      Protected Activity

Defendants argue plaintiff did not speak as a private citizen in his communications with Lieberman and the communications did not respect matters of public concern.

The Court disagrees.

"If the court determines that the [employee] either did not speak as a citizen or did not speak on a matter of public concern, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Sousa v. Roque, 578 F.3d 164, 170 (2d Cir. 2009); see also Garcetti v. Ceballos, 547 U.S. 410, 421–22 (2006) ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created.").  A public employee speaks as a citizen if (i) the speech "fall[s] outside of the employee's official responsibilities," and (ii) there is a "civilian analogue" to the method of speaking.  Matthews v. City of New York, 779 F.3d 167, 173 (2d Cir. 2015).

When asking whether a public employee spoke as a private citizen, the "critical question . . . is whether the speech at issue is itself ordinarily within the scope of [the] employee's duties, not whether it merely concerns those duties." Montero v. City of Yonkers, 890 F.3d 386, 398 (2d Cir. 2018).  To answer that question, courts "examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two.  Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision." Ross v. Breslin, 693 F.3d 300, 306 (2d Cir. 2012).  Indeed, "[w]hen a public employee speaks pursuant to [his or her] employment responsibilities . . . there is no relevant

analogue to speech by citizens who are not government employees." <u>Montero v. City of Yonkers</u>, 890 F.3d at 395 (alteration in original).

First, plaintiff's March 2016 emails with Lieberman largely demonstrate plaintiff spoke as a private citizen in his communications with Lieberman.  The communications do not purport to address SIU matters, information plaintiff gleaned from his position at the SIU, or information concerning plaintiff's responsibilities at the SIU or CPD.  Indeed, the March 2016 thread of emails between plaintiff and Lieberman concern a variety of topics—Michael Garvey's lawsuit against the Town, the Town's potential settlement of the lawsuit, and large campaign contributions and their alleged effect on an efficiency study concerning the CPD the Town was planning to initiate with the help of someone with ties to Astorino—in addition to two emails respecting the Picott incident.

Second, plaintiff's communications with Lieberman largely respect matters of public concern, namely, potential public corruption or mere news.  "'[P]ublic corruption or wrongdoing' is almost always a matter of public concern." <u>Murray v. Town of N. Hempstead</u>, 853 F. Supp. 2d 247, 264 (E.D.N.Y. 2012) (quoting <u>Lewis v. Cowen</u>, 165 F.3d 154, 164 (2d Cir. 1999)).  Moreover, the two Picott emails do not clearly demonstrate a non-public matter.  Indeed, in asking plaintiff on March 28, 2016, "What's up with Picot[t]?  Is he out[?]" (Mele Decl. Ex. 20 at ECF 1), Lieberman simply could have been asking whether Picott had come out of his house earlier that day during the domestic incident at his home, not whether plaintiff had any information respecting Picott's continued employment with the CPD.

Furthermore, plaintiff's response to Lieberman's inquiry—that Lieberman should call plaintiff because plaintiff didn't "want an email on that"—raises a genuine issue of material fact as to whether plaintiff inappropriately shared with Lieberman information germane to plaintiff's

employment with the CPD, but does not demonstrate plaintiff spoke to Lieberman about a non-public matter.  Plaintiff testified that following this email, he and Lieberman spoke on the phone but did not discuss the Picott incident.  Although defendants argue such testimony is not credible, that determination is a function for a jury, not a judge.  See Davis-Garett v. Urban Outfitters, Inc., 921 F.3d at 46.

      B.      Adverse Employment Action

Defendants contend that upon plaintiff's reassignment to the JAB, his salary did not change, he maintained his rank, he received a promotion because Chief Sullivan gave him a new title, and his work hours were not significantly altered.  (Doc. #175 ("Defs. Mem.") at 16).  Defendants further argue plaintiff's post-transfer duty assignment to the JAB was not dictated by defendants, but determined first by Chief Sullivan, and thereafter continued by Acting Chief Mahon.  Accordingly, defendants claim the record evidence demonstrates that, as a matter of law, plaintiff did not suffer an adverse employment action.

The Court disagrees.

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation."  Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003).

"A plaintiff may suffer adverse employment action even without dismissal, reduction in pay, or demotion in rank."  Kiernan v. Town of Southampton, 734 F. App'x 37, 41 (2d Cir. 2018) (summary order).  "An adverse employment action may include . . . reprimanding an employee."  Montero v. City of Yonkers, 890 F.3d 386, 401 (2d Cir. 2018).  "Curtailment of job responsibilities may also be adverse."  Kiernan v. Town of Southampton, 734 F. App'x at 42.  Indeed, "an adverse employment action can exist when an employee's new assignment is

materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement." Beyer v. County of Nassau, 524 F.3d 160, 165 (2d Cir. 2008). "However, a forced transfer . . . is not an adverse employment action if the terms, privileges, duration, or condition of a plaintiff's employment do not change." Pimentel v. City of New York, 74 F. App'x 146, 148 (2d Cir. 2003) (summary order).

Here, the record evidence demonstrates that plaintiff was removed as Director of the SIU by Chief Sullivan pursuant to the direction from Hoehmann after consultation with the other members of the Town Board. In other words, Hoehmann and the Town Board's conduct caused plaintiff to be reassigned to JAB from the SIU. As a result, plaintiff was removed from his position as Director of a county-wide intelligence task force and reassigned to a position within CPD headquarters. Plaintiff testified that his new title as Detective Sergeant of JAB was in name only; that JAB already had a detective sergeant; and that in this new position, he did not supervise or manage any other CPD employees.

Thus, a reasonable juror could conclude, based on the record evidence, that plaintiff suffered an adverse employment action when he was removed as Director of the SIU and reassigned to JAB.

C.     Causal Connection

Defendants further argue plaintiff cannot as a matter of law demonstrate a causal connection between a protected activity and an adverse employment action.

Again, the Court disagrees.

"To establish causation, a plaintiff must show that his protected activity was a substantial motivating factor in the adverse employment decision." Bierce v. Town of Fishkill, 656 F. App'x at 552. "This may be done either directly, by evidence of retaliatory animus, or indirectly,

by circumstantial evidence, such as by showing that the protected activity was closely followed in time by the adverse employment decision." Id. Moreover, "for protected conduct to be a substantial or motivating factor in a decision, the decision makers must be aware of the protected conduct." Wrobel v. County of Erie, 692 F.3d at 32.

Defendants argue the record evidence demonstrates defendants had not seen, and did not know of, any communications between plaintiff and Lieberman, except for the two Picott emails, when they met on June 28, 2016, and when Chief Sullivan was given orders to transfer plaintiff from his position at the SIU to a different position in which plaintiff would not be responsible for communicating with the press. Further, defendants argue the record demonstrates that neither Hoehmann nor any other defendant instructed Balascio to search the Google Vault system to uncover evidence that plaintiff had been communicating with the press.

But here, the record evidence comprises testimony and documentary evidence from which a reasonable juror could infer a causal connection between plaintiff's communications with Lieberman and plaintiff's transfer from the SIU to a position at the JAB within CPD headquarters. For instance, although Balascio testified he did not discover the entire thread of eleven emails between plaintiff and Lieberman when he discovered the Picott emails, it is undisputed that the Picott emails indeed were part of a larger thread of emails. Because all of the emails were part of a single email chain, a genuine issue of material fact exists as to whether Balascio also discovered the other emails, and whether Balascio had shared that information with any of the defendants before or during the June 28, 2016, Town Board meeting.

Moreover, although Balascio testified he discovered the Picott emails shortly after March 28, 2016, while searching the Google Vault database for information about Gromack, the audit log demonstrates that in June 2016, Balascio ran searches in the Google Vault program

20

seemingly to uncover information regarding whether Town employees, including plaintiff, were communicating about matters having nothing to do with the March 28, 2016, Picott incident, but rather, perhaps, about public corruption.  Indeed, the audit log shows that between April and August 2016, Balascio searched the term "Garvey" over seventy times, "Lohud"[9] nine times, "Lieberman" sixteen times (all on June 3, 2016), and "Rockland County Strategic Intelligence Unit" eight times.  (See generally Audit Log).  The audit log further indicates Balascio searched for those terms within the general Town database, and also within plaintiff's individual email account, in which Balascio also searched for emails that included the word "Astorino."  (Audit Log at ECF 189).  During his deposition, Balascio could not recall why he had conducted such searches.  (Balascio Tr. at 117–125).  And the audit log, which comprises a list of all searches of the Google Vault system between February 2, 2016, and February 7, 2017, does not show a single search of the term "Picott."  (See generally Audit Log).

The above record evidence, coupled with the facts that on June 28, 2016, defendants formally initiated an investigation into plaintiff's press contacts and, soon thereafter, directed his reassignment from the SIU, raise genuine issues of material fact as to whether plaintiff's March 2016 non-Picott-related communications with Lieberman—about the Michael Garvey lawsuit, an upcoming Town Board vote, a planned Town efficiency study, and large campaign donations—constituted a substantial motivating factor in a decision to reassign plaintiff from his position at the SIU to retaliate against him.

The summary judgment record further evinces a dispute of material fact as to when defendants learned of plaintiff's communications with Lieberman.  For instance, the record

---

[9]     The Court takes judicial notice that "Lohud" is the website of the Journal News, the newspaper for which Lieberman reports.  See Lohud, https://www.lohud.com/news/ (last visited September 12, 2020).

evidence raises a question of fact as to when Hoehmann learned of such communications, given that the evidence demonstrates Balascio, as Hoehmann's chief of staff (Hoehmann Tr. at 187), had conducted the above-referenced searches long before the June 28, 2016, Town Board meeting, at which defendants claim they learned for the first time of the Picott emails. Moreover, although defendants claim they were not made aware of the other nine emails in the March 2016 email thread "until well after the alleged adverse actions took place" (Defs. Mem. at 22), a reasonable factfinder could conclude, based on the record evidence, that defendants knew of these emails before the June 2016 Town Board meeting.

In their reply memorandum, defendants argue the audit log should be disregarded because it is not presented in admissible form.  Specifically, defendants contend plaintiff "failed to present 'testimony of [a record] custodian or another qualified witness' that the Google Log was made at or near the time of the information contained therein; that the Google Log was kept in the course of a regularly conducted activity of the Town; or that it was in the regular practice of the Town to maintain such a log."  (Doc. #181 ("Defs. Reply") at 3 (quoting Fed. R. Evid. 803(6)(D))).

The Court is not persuaded.  Defendants do not challenge the authenticity of the information in the audit log, but rather, the admissibility of the document itself.  "[A] party is not required to authenticate documents on a summary judgment motion where . . . authenticity is not challenged by the other party," but rather, admissibility.  See Long v. New York City, 2016 WL 4203545, at *2 n.4 (S.D.N.Y. Aug. 8, 2016).  And surely, at trial, plaintiff could both properly authenticate the log and lay a proper business records foundation for the log.

As an additional matter, plaintiff also claims the directive to reassign plaintiff resulted in other adverse employment actions, including taking back a car plaintiff had been assigned to

perform his duties as Director of SIU, and being moved from an office to a cubicle.  Regardless of whether these actions constitute adverse employment actions on their own, see Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 226 (2d Cir. 2006) (noting "adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," as well as "lesser actions"), these actions further support finding a disputed issue of material fact as to whether there is a causal connection.

Accordingly, a reasonable juror could infer, based on the record evidence, a causal connection between plaintiff's protected activity and the alleged adverse employment actions.

D.      Qualified Immunity

Defendants argue they are entitled to qualified immunity with respect to plaintiff's First Amendment retaliation claims because the record demonstrates that each allegedly adverse employment action was the result of conduct taken on advice of counsel.

The Court disagrees.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  A qualified immunity defense is established where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law."  Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998).

At all times relevant to plaintiff's claims, it was clearly established law that retaliation against a public employee for protected speech violates the Constitution.

23

Moreover, the record evidence demonstrates material issues of fact, which preclude at this stage of the proceedings a determination that it was objectively reasonable for defendants to have participated in the allegedly retaliatory complained-of conduct.

Accordingly, defendants are not entitled to qualified immunity.

E.    *Pickering* Defense

Defendants argue that even if plaintiff can maintain First Amendment retaliation claims, they nevertheless are entitled to summary judgment pursuant to Pickering v. Board of Education, 391 U.S. 563 (1968).

The Court disagrees.

The Pickering defense excuses an adverse employment action if "(1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption." Castine v. Zurlo, 756 F.3d 171, 176 (2d Cir. 2014) (emphasis added).

Again, the record evidence demonstrates material issues of fact as to whether defendants took adverse employment action against plaintiff in retaliation for plaintiff's protected conduct. Accordingly, defendants are not entitled to summary judgment pursuant to the Pickering defense.

For the above reasons, defendants' motion for summary judgment on plaintiff's First Amendment retaliation claims is denied.

III.   Constructive Discharge

Defendants ague plaintiff fails as a matter of law to establish a constructive discharge claim.

The Court disagrees.

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily . . . . [W]orking conditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  Terry v. Ashcroft, 336 F.3d 128, 151–52 (2d Cir. 2003).

Here, although plaintiff resigned immediately after being placed on administrative leave for having removed his work computer's hard drive and deleting information therefrom after being told his computer was going to be secured for an investigation, a reasonable juror could nevertheless conclude, based on the record evidence, that plaintiff resigned due to a series of retaliatory measures taken against him because of certain communications he had with the press, as noted above.  Such measures include, for example, plaintiff's reassignment from the SIU to JAB, Hoehmann's August 24, 2016, letter to the USAO, and the Town's Article 78 counterclaim against plaintiff.  As discussed above at length, there exist several genuine issues of material fact as to whether the above actions constitute unlawful retaliatory conduct.

Accordingly, the record evidence is sufficient to permit a reasonable trier of fact to infer that the alleged adverse employment actions were so difficult or unpleasant that a reasonable person in plaintiff's shoes would have felt compelled to resign.

For the above reasons, defendants' motion for summary judgment is denied insofar as it concerns plaintiff's constructive discharge claim.

IV.    Equal Protection Claim

Defendants briefly argue that plaintiff's equal protection claim fails as a matter of law because plaintiff cannot maintain a First Amendment retaliation claim.

"Where, as here, an equal protection claim is based on an alleged First Amendment violation, the former coalesces with the latter." Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals, 812 F. Supp. 2d 357, 372 (S.D.N.Y. 2011).  "Where this is the case, the equal protection claim is dependent on the First Amendment claim; in other words[,] where the First Amendment claim has failed, the equal protection claim fails, too." Id.

Having denied defendants' motion for summary judgment with respect to plaintiff's First Amendment retaliation claims, defendants' motion is also denied to the extent it seeks summary judgment on plaintiffs' equal protection claim.

V.    Personal Involvement

Finally, defendants argue Councilmen Borelli and Noto and Councilwoman Carey are entitled to summary judgment as a matter of law because they did not personally participate in any of plaintiff's alleged adverse employment actions.  Further, defendants contend plaintiff failed to oppose this argument in his opposition to the instant motion, and, therefore, plaintiff has conceded the point.

The Court disagrees.

As a preliminary matter, as set forth herein, the record evidence demonstrates there are material issues of fact as to when defendants learned of plaintiff's communications with Lieberman, how they learned of plaintiff's communications with Lieberman, and what communications, if any, served as the basis for any alleged adverse employment actions against plaintiff.

Moreover, Hoehmann's July 1, 2016, email to Chief Sullivan states expressly it is the Town Board's position "that there is a substantial risk to the Town . . . in leaving Sergeant Cole-Hatchard in his current position."  (Loomba Decl. Ex. T at ECF 3).  And defendants

acknowledge Borelli, Noto, and Carey "were consulted" as to whether plaintiff should be transferred from his position at the SIU.  (Defs. Mem. at 23).

Furthermore, the August 24, 2016, letter from Hoehmann to the USAO begins with Hoehmann stating "[w]ith the unanimous support of the Town Board, I write in my capacity as the Supervisor of the Town of Clarkstown to report evidence of what appears to be illegal profiling" by certain members of the CPD, including plaintiff, in his capacity as Director of the SIU.  (Loomba Decl. Ex. Z at ECF 1).

And finally, the August 29, 2016, answer to Chief Sullivan's Article 78 petition, which included the counterclaim against plaintiff discussed herein, was submitted on behalf of the Town Board and its individual members, including Borelli, Noto, and Carey.

For the above reasons, summary judgment in favor of Borelli, Noto, and Carey, is not warranted on the ground of lack of personal involvement.

**CONCLUSION**

The motion for summary judgment is DENIED.

The Clerk is instructed to terminate the motion (Doc. #172).

Counsel are directed to appear for a telephone status conference on <u>October 28, 2020, at 3:00 p.m.</u>, at which time the parties shall be prepared to discuss, among other things, the setting of a trial and a schedule for pretrial submissions, and what efforts they have made or will make to settle this case.  In light of the current public health crisis, the conference will be conducted by telephone conference.  Counsel shall attend the conference by calling the following number and entering the access code when requested:

> **Dial-In Number:**      **(888) 363-4749 (toll free) <u>or</u> (215) 446-3662**
>
> **Access Code:**          **1703567**

Dated:  September 21, 2020
        White Plains, NY

                              SO ORDERED:

                              _____
                              Vincent L. Briccetti
                              United States District Judge